## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| TRENT M., | Case No. 20-cv-1738 (ECT/JFD) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| KILOLO KIJAKAZI, *Acting Commissioner of Social Security*, | |
| Defendant. | |

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Trent M. seeks judicial review of a final decision by Defendant Commissioner of Social Security denying his application for a period of disability and for disability insurance benefits ("DIB"). The case has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. The matter is now before the Court on Plaintiff's Motion for Summary Judgment (Dkt. No. 27) and Defendant's Motion for Summary Judgment (Dkt. No. 36). Because the Commissioner's decision is free of legal error and is supported by substantial evidence in the record as a whole, the undersigned recommends denying Plaintiff's Motion for Summary Judgment, granting Defendant's Motion for Summary Judgment, and affirming the Commissioner's decision.

## I.    BACKGROUND

On March 15, 2017, Plaintiff, a 41-year-old male with a high school education, applied for a period of disability and DIB under Titles II and XVIII of the Social Security

Act. (Soc. Sec. Admin. R. (hereinafter "R.") 52, 61, 242–43.)[1] The alleged onset of disability was October 26, 2015. (R. 242.) Plaintiff reported that the following conditions limited his ability to work: bone stiffness, rheumatoid arthritis ("RA"), shoulder pain, restless leg syndrome, depression, and anxiety. (R. 53.)

The Social Security Administration ("SSA") denied Plaintiff's application both initially and on reconsideration. (R. 81 (initial), 84 (reconsideration).) Plaintiff then timely requested a hearing before an administrative law judge ("ALJ"). (R. 100.) A hearing was held before ALJ Micah Pharris on June 5, 2019, in Minneapolis, Minnesota. (R. 37.) Plaintiff testified at the hearing and was represented by counsel. (R. 39–46.) Vocational Expert Robert Brezinski also testified at the hearing by telephone. (R. 47–51, Dkt. No. 23-2, pp. 38 – 52, 41.)

**A.  The Administrative Hearing Before The ALJ**

At the hearing before the ALJ, Plaintiff testified to a number of medical conditions, including severe RA, which Plaintiff claimed had not been responsive to any medications thus far, and which caused stiffness in his ankles, hands, and shoulders. (R. 42, 44.) Plaintiff testified the pain from his arthritis kept him awake at night. (R. 42.) He also testified to rotator cuff detachment in both shoulders. Though he had undergone surgery to reattach his right rotator cuff, he not had not yet had surgery on his detached left rotator

---

[1] The Social Security administrative record is filed at Dkt. No. 23 through Dkt. No. 23-15. The record is consecutively paginated, and the Court cites to that pagination rather than docket number and page.

cuff. (R. 41.) Plaintiff also testified that a herniated disc in his lumbar spine caused numbness in his legs, toes, and hips. (R. 41-42.)

Plaintiff testified that he lived with his girlfriend and, on good days, he helped get her children ready for school each day, did most of the household cooking, helped with vacuuming, and fed, watered, and let out the household's dogs. (R. 43.) Plaintiff did not go outside and walk the dogs, however. (R. 43.) As to outdoor chores, Plaintiff testified that he mowed the grass with a riding mower and cleared out the garage with a leaf blower. (R. 43.)[2] Plaintiff testified that he had a driver's license but that he limited his driving to destinations within an hour of home. (R. 45.) This included doing some grocery shopping. (R. 45.) Plaintiff testified that he had a smart phone, but that it was hard to hold the phone for more than five or ten minutes without his hands cramping. (R. 45.) However, Plaintiff also testified that he could type texts on a good day. (R. 45.) Plaintiff testified that it could take him up to two hours in the morning to stop being hunched over. (R. 44.)

The foregoing, Plaintiff testified, were his capabilities on a good day. By contrast, when Plaintiff was having a bad day he would stay in bed all day, watching TV, and taking pills. (R. 44.)

Plaintiff also testified to psychiatric symptoms, specifically to depression, anxiety, and social anxiety in groups, which led him to limit his interactions with other people. (R.

---

[2] The ALJ included, among Plaintiff's outside activities, using a snowblower. This appears to be a mistake. Plaintiff correctly points out in his summary judgment brief that the only reference to a snowblower in the administrative record is Plaintiff injuring his hands when he attempted to use a snowblower. Plaintiff did testify at the ALJ hearing, however, that on good days he used a leaf blower to clean out his garage. The Court finds the ALJ's reference to a snow blower rather than a leaf blower to be harmless error.

45-46.) Plaintiff also testified that he has anger issues, particularly when interacting with people he considers stupid. (R. 46.)

Plaintiff testified that his hobbies were hunting and fishing. (R. 46.) He testified that he went deer hunting every year, and to a cabin for fishing as often as possible, which translated to once or twice each month. (R. 46.)

The ALJ asked Vocational Expert Brezinski to assume a hypothetical worker of Plaintiff's age and education who was limited to performing light work and also had limitations including never climbing ropes, ladders, or scaffolds, and only occasionally climbing stairs or ramps; occasionally balancing, stooping, kneeling, crouching, and crawling; occasionally reaching overhead; and frequently handling or fingering. (R. 47.) The ALJ further asked the vocational expert to assume this hypothetical individual was limited to simple, routine tasks and may interact with supervisors, coworkers, or members of the public with occasional frequency and in a superficial way. (R. 47.) Mr. Brezinski testified that such a person could not return to Plaintiff's former occupation of construction worker. (R. 48.) However, Mr. Brezinski testified that there were jobs such a person could perform, and gave as examples unskilled light electronics work, light cleaning, and light assembly work. (R. 48.) Mr. Brezinski testified that in the national economy 15,000 light electronics jobs existed, 125,000 light cleaning jobs existed, and 30,000 light assembly jobs existed.[3] (R. 48).

---

[3] The limitations the ALJ asked Mr. Brezinski to assume correspond with the ALJ's findings about Plaintiff's Residual Functional Capacity, as described more fully below.

The ALJ then asked Mr. Brezinski to further assume that the hypothetical worker would be limited to sedentary work, could only occasionally reach overhead and would only occasionally handle and finger. (R. 49.) The person would need breaks so frequently during the day that the person would be off-task at least 20 percent of the workday.[4] (R. 49). Mr. Brezinski testified that with those additional restrictions, particularly the requirement for frequent breaks, not only could such a person not return to Plaintiff's former occupation of construction worker, but there would be no work available in the national economy for such a person. (R. 49.)

**B. The ALJ's Written Decision**

In a written decision dated June 24, 2019, the ALJ found Plaintiff not disabled and denied Plaintiff's DIB application. (R. 7–26.) Using the five-step sequential methodology made applicable to DIB determinations by 20 C.F.R. § 404.1520(a), the ALJ determined in step one that Plaintiff had not engaged in substantial, gainful activity since October 26, 2015, the date Plaintiff claims his period of disability began. (R. 12.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: bilateral shoulder degenerative joint disease, left cubital tunnel syndrome, RA, lumbar degenerative disc disease, S1 joint dysfunction, a history of patellar dislocation and surgery, generalized anxiety disorder, depression, and attention deficit hyperactivity disorder. (R. 12.) The ALJ found Plaintiff's reported chest pain and palpations were not

---

[4] These more significant limitations, particularly the restriction about the time off-task the hypothetical worker would need, appear to come from an opinion from Plaintiff's physician, Dr. Darin Skaudis.

5

severe, as was also true of Plaintiff's psoriasis, insomnia, hyperlipidemia, right hand fractures, and migraines. (R. 12–13.) Although Plaintiff complained of post-traumatic stress disorder, the ALJ found that not to be a medically determinable impairment based on the record evidence. (R. 13.)

Moving to step three, the ALJ found none of Plaintiff's impairments, whether considered singly or in combination, met or medically equaled the severity of any listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13.) The ALJ paid particular attention to Listing 1.02, major dysfunction of a joint. (R. 13.) However, the ALJ found the record contained "no objective evidence of inability to ambulate effectively or perform fine or gross motor movements effectively" because of either Plaintiff's right shoulder degenerative joint disease or his patellar dislocation and surgery. (R. 13.) The ALJ analyzed Plaintiff's RA under Listing 14.09, inflammatory arthritis. (R. 14-15.) The ALJ found Plaintiff had not lost his ability to ambulate effectively or his ability to perform fine and gross motor skills. (R. 14.) Nor, found the ALJ, did Plaintiff's arthritis cause impairment in any of the other numerous and detailed manners described in Listing 14.09. (R. 14-15.)

The ALJ found that Plaintiff's back complaints neither met nor equaled Listing 1.04, disorders of the spine. (R. 13.) The ALJ did find some evidence of spinal disorder, but no evidence of compromise of a nerve root, limitation of motion of the spine, or motor loss with sensory or reflex loss. (R. 13.)

The ALJ found that Plaintiff's left cubital tunnel syndrome neither met nor equaled Listing 11.14, because Plaintiff did not have extreme limitations in his ability to use his upper extremities, nor did Plaintiff have limitations of physical functioning. (R. 14.)

Because Listing 14.06, undifferentiated and mixed connective tissue disease with any involvement of two or more organs/body systems, requires at least a moderate level of severity plus severe fatigue, fever, malaise, or involuntary weight loss, and Plaintiff did not manifest those symptoms, the ALJ found this listing was neither met nor equaled. (R. 14.)

Turning to Plaintiff's severe mental impairments, the ALJ found they neither met nor equaled the criteria of Listings 12.04, 12.06, or 12.11. (R. 15–17.)

Before beginning step four, the ALJ determined Plaintiff's Residual Functional Capacity ("RFC"), which is defined as the most a claimant can do despite the limitations imposed by his impairments. 20 C.F.R. § 404.1545(a)(1). When determining Plaintiff's RFC, the ALJ was required to consider all of Plaintiff's impairments, not just those that were severe. 20 C.F.R. § 404.1520(e). Here, the ALJ found that Plaintiff had the RFC to perform "light work." (R. 17.) "Light work" involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. § 404.1567(b). The ALJ modified the description of light work by determining that Plaintiff could never climb ropes, ladders, or scaffolds, but might occasionally climb ramps or stairs. (R. 17.) The ALJ determined that Plaintiff could occasionally balance, stoop, kneel, crouch, or crawl, could occasionally reach overhead with either arm, and could frequently handle and finger. (R. 17.) The ALJ limited Plaintiff to simple, routine tasks, and further limited him to having only occasional and superficial contact with supervisors,

coworkers, and the public. (R. 17.) Given Plaintiff's RFC, the ALJ concluded at step four that Plaintiff could not return to his past relevant work as a construction worker. (R. 24.)

At the last step of the five-step sequential decisional process, the ALJ considered whether—considering not only Plaintiff's RFC, but also his age, education, and work experience—Plaintiff could make a successful adjustment to other work. (R. 25.) Based on testimony from vocational expert Mr. Brezinski, the ALJ found that Plaintiff could perform work such as light cleaning, light electronics work, and light assembly work. (R. 25.) The ALJ found that such jobs existed in the national economy in significant numbers. (R. 25.) Because Plaintiff could perform the duties of jobs that existed in significant numbers in the national economy, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 26.)

The SSA Appeals Council declined to review the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (R. 1). Plaintiff then timely sought judicial review by this Court. (Compl., Dkt. No. 1.)

## II.    STANDARD OF REVIEW

Courts review the final decision of an Executive Branch agency under a substantial evidence standard. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citing *T-Mobile South, LLC v. Roswell*, 574 U.S. 293, 301-02 (2015)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id*. (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (cleaned up). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it

adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F. 3d 1010, 1012 (8th Cir. 2000)); *see also Biestek*, 139 S. Ct. at 1154 ("Substantial evidence is 'more than a mere scintilla . . . .'") (quoting *Consolidated Edison Co.*, 305 U.S. at 229). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F. 3d at 1022 (citing *Craig v. Apfel*, 212 F. 3d 433, 436 (8th Cir. 2000)). In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the Commissioner's decision. *Robinson v. Sullivan*, 956 F. 2d 836, 838 (8th Cir. 1992).

The burden of proving disability is on the claimant. See *Roth v. Shalala*, 45 F. 3d 279, 282 (8th Cir. 1995). To be disabled under the Social Security Act, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disability, not just the impairment, must have lasted, or be expected to last, at least 12 months. *Titus v. Sullivan*, 4 F. 3d 590, 594 (8th Cir. 1993).

## III.    ANALYSIS

Plaintiff argues that the ALJ both committed legal error and issued a decision that was not supported by substantial evidence. Plaintiff argues that the ALJ erred legally by using the wrong standard when deciding how much weight to give to an opinion of Plaintiff's treating physician, and that the ALJ's inclusion in Plaintiff's RFC of a finding

that Plaintiff could frequently use his hands and fingers is not supported by substantial evidence in the record. For the reasons below, the Court concludes that Plaintiff is incorrect as to both arguments.

1. **The ALJ Used the Proper Legal Standard in Deciding How Much Weight to Give Medical Source Opinions and Substantial Evidence Supports the ALJ's Decisions of How Much Weight to Give**

Plaintiff argues that the ALJ committed legal error by giving insufficient deference to the opinion of his treating physician, Dr. Skaudis. (Pl.'s Mem. Supp. Mot. Summ. J. at 7–9, Dkt. No. 28.) Plaintiff observes that his DIB application was filed on March 14, 2017, which was before the March 27, 2017 effective date of amendments to the Code of Federal Regulations that changed how ALJs review medical opinion evidence.[5] Plaintiff argues that under the properly applicable standard, the ALJ was obliged to give "controlling weight" to the opinion of Plaintiff's treating provider, and that application of the newer, less deferential standard was legal error. (Pl.'s Mem. Supp. Summ. J. at 7–8 & n. 3.) Plaintiff also argues that whatever weight the ALJ gave to Dr. Skaudis's opinion, the ALJ was required to give "good reasons" for the weight assigned. (*Id*. at 8.)

The Court agrees that the ALJ was required to use the pre-March 27, 2017 standard in deciding what weight to give to the opinion of a treating physician. The Court finds,

---

[5] Effective March 27, 2017, 20 C.F.R. § 404.1520c replaced the regulations set forth in 20 C.F.R. § 404.1527 for claims filed on or after the effective date. The amendments changed how an ALJ must consider and weigh medical opinions. Before the 2017 amendments, opinions from medical sources with a longstanding treatment relationship could be deemed controlling evidence. *See* 20 C.F.R. § 404.1527(c)(2). For claims filed on or after March 27, 2017, all medical opinions are evaluated using the same five factors. *See* 20 C.F.R. § 404.1520c(c).

however, that the ALJ did so. (*See* R. 17 ("I have also considered opinion evidence in accordance with the requirements of 20 [C.F.R. §] 404.1527.").) The ALJ's cite is to the former, more deferential standard. The post-March 27, 2017 standard is at 20 C.F.R. § 404.1520c. The Court further concludes that under the applicable standard, the ALJ's decision to give little weight to the Medical Source Statement from Dr. Skaudis was correct, because Dr. Skaudis's more extreme limitations on Plaintiff's activities are not supported by medically acceptable clinical and laboratory diagnostic techniques and are not consistent with other substantial evidence in the record.

Under the regulations applicable to Plaintiff, ALJs generally gave "more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). If the treating source's opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in [the] case record," it would be given "controlling weight." *Id.* When the opinion was not given controlling weight, the ALJ considered various factors listed in § 404.1527(c) to determine the proper weight to give the opinion. *Id*. The ALJ was not required to discuss each and every factor as long as he gave good reasons for the weight assigned. *Alaa M. K. A. v. Saul*, No. 20-CV-1066 (SRN/HB), 2021 WL 3023743, at *8 (D. Minn. July 1, 2021), *R. & R. adopted*, 2021 WL 3022699 (D. Minn. July 16, 2021); *Belinda*

*B. v. Saul*, No. 20-CV-488 (JRT/LIB), 2021 WL 537932, at *8 n.6 (D. Minn. Jan. 28, 2021), *R. & R. adopted*, 2021 WL 533689 (D. Minn. Feb. 12, 2021).

The Court finds that the ALJ used the proper methodology in deciding how much weight to give to Dr. Skaudis's opinion, and that the ALJ adequately explained his decision. A brief, chronological description of Plaintiff's course of treatment for RA will provide useful context for the following discussion explaining why the Court makes these findings.

On December 17, 2015, Plaintiff was seen at Allina Health's New Ulm Medical Center, complaining of "pain and stiffness in every joint" that had begun about ten days earlier. (R. 518.) The examining physician found that Plaintiff's joints were not tender when palpated, and that he had a normal range of motion. (R. 519.) Plaintiff was taking no prescription medications at that time. (R. 518.) The treating physician ordered several laboratory tests to investigate the cause of the symptoms and prescribed Aleve and Tylenol. (R. 519.) On February 5, 2016, Plaintiff was prescribed methotrexate because "the RA has been causing some pain." R. (537.)

Just a few days after being started on methotrexate, Plaintiff relocated from southwestern Minnesota to Hibbing, where, on February 18, 2016, he first saw Dr. Skaudis. (R. 682.) Plaintiff told Dr. Skaudis that he was beginning to notice slight improvement to his pain and stiffness from the methotrexate. (R. 682.) Dr. Skaudis increased Plaintiff's dose of methotrexate and added prednisone to Plaintiff's medication regimen. (R. 688.) Dr. Skaudis also referred Plaintiff for evaluation by a specialist in rheumatology. (R. 689.)

At the rheumatology referral, conducted at Essentia Health in Duluth on April 13, 2016, rheumatologist Dr. Frank E. Scott found that Plaintiff had a full range of motion in

his shoulders and elbows, with no swelling or tenderness. (R. 884.) As to Plaintiff's hands, Dr. Scott found no issues other than some slight swelling of one joint of Plaintiff's right hand. (R. 884.) Plaintiff was found to have a full range of motion, no swelling or tenderness, and good hand grip and pinch strength. (R. 884.)

Plaintiff saw Dr. Scott for a rheumatology follow-up at Essentia one year later, on April 12, 2017. Plaintiff told Dr. Scott that he had discontinued his medications about four months earlier. (R. 882.) Despite this, Dr. Scott found Plaintiff to be doing well; Plaintiff had a full range of motion in every joint Dr. Scott evaluated, and no pain. (R. 882.) Dr. Scott found low or absent disease activity at that time, and no medications or other therapy were prescribed. (R. 882.)

Two months later, Plaintiff  visited Essentia for a flare-up of his RA. (R. 879.) He reported taking Tylenol for pain. (R. 879.) On examination, Stephanie Lundblad, CNP, found tenderness in Plaintiff's shoulders, some spinal stiffness, swollen wrists, pain and stiffness when Plaintiff made a fist, mildly swollen ankles, and pain in his feet. (R. 880.) Ms. Lundblad prescribed a "burst" of prednisone, at a higher dose than prescribed in the past, to bridge the gap until his new medication, Arava, began working.  (R. 881.) When seen by Dr. Skaudis on July 28, 2017, Plaintiff still had moderate stiffness, his fingers deviated from straight, his knuckles were swollen and red, and he walked with a limp. (R. 1054.) Dr. Skaudis prescribed a cane. (*Id.*) Nonetheless, Dr. Skaudis wrote, "looks pretty good." (R. 1054.)

In late August 2017, again at Essentia Health's rheumatology clinic, Plaintiff was found to have swollen wrists, various hand issues such as stiffness and pain when making

13

a fist, and issues with his feet. (R. 991.) The severity of Plaintiff's hand symptoms was described as "slight." (R. 991.) Ms. Lundblad noted that Plaintiff had a normal gait and did not need an assistive device. (R. 991.)

Plaintiff relocated to the Twin Cities area sometime after August of 2017. On August 3, 2018, Plaintiff was seen by a rheumatology specialist physician at Fairview Health in Maple Grove, Dr. Nikita Ghattaura. (R. 1235.) Dr. Ghattaura found that Plaintiff's inflammatory markers had improved and were normal. (R. 1235; *cf.* R. 682 (by contrast, when Plaintiff first went to Allina Health in New Ulm in 2015, his inflammatory markers were very high).) Plaintiff's knuckles, wrists, elbows, and ankles were all noted to be tender, and he had some ulnar deviation of his fingers and medial deviation of his wrists. (R. 1235.) No range of motion limitations were noted. Plaintiff saw Dr. Ghattaura again on January 3, 2019. (R. 1305.) Dr. Ghattaura found Plaintiff essentially unchanged—he still had radial deviation of his wrists, ulnar deviation of his fingers, and tenderness in the same joints noted in 2018. Again, no range of motion limitations were documented. (R. 1306.)

With the above overview of Plaintiff's RA in mind, the Court turns now to the Medical Source Statement completed by Dr. Skaudis on July 28, 2017 (R. 977–81), which was slightly less than two months after Plaintiff's RA turned for the worse. Plaintiff argues the ALJ should have given controlling weight to the Medical Source Statement.[6] As to

---

[6] Saying "Plaintiff argues . . ." makes Plaintiff's argument seem clearer than the Court actually found it. Plaintiff describes the two standards in 20 C.F.R. § 404.1527 (claims filed before March 27, 2017) and § 404.1520c (claims filed on or before March 27, 2017), and states the law governing how an ALJ should decide what weight to give a particular medical opinion, but does not, explicitly, allege that the ALJ violated either. However, because that seems the obvious conclusion to draw from what Plaintiff *does* say—it would

physical health, Dr. Skaudis opined that in an eight-hour workday, Plaintiff could sit for only one to two hours, and could stand for less than one hour. (R. 979.) Occasionally, Plaintiff could lift up to ten pounds. (R. 979.) Plaintiff could rarely lift more than that, and could rarely twist, stoop, crouch, or climb ladders or stairs. (R. 979.) Plaintiff could not walk more than one or two city blocks without stopping because of pain and required the use of a cane. (R. 979.) Dr. Skaudis opined that Plaintiff would require unscheduled breaks of ten to fifteen minutes' duration once per hour, would be "off task" at least 25% of any given workday, and would miss four days of work per month. (R. 979.)

As to Plaintiff's mental functioning, Dr. Skaudis found that Plaintiff had "marked difficulty" in the following areas: maintain attention and concentration for extended periods; deal with stress of skilled and semi-skilled work; work in coordination with or proximity to others without distraction; complete a normal workday/week without interruption; perform at a consistent pace without unreasonable number of rests; and accept instructions and respond appropriately to criticism.[7] (R. 981.)

The Court concludes that the ALJ's decision to assign little weight to Dr. Skaudis's July 28, 2017 opinion was made under the appropriate iteration of the Social Security regulations and was supported by substantial evidence on the record as a whole. The

---

be odd for Plaintiff to cite law and not have a reason for doing so—the Court treats Plaintiff's brief as arguing that the ALJ applied the wrong standard when deciding how much weight to place on Dr. Skaudis's July 28, 2017 opinion.

[7] At the hearing, the ALJ incorporated the limitations set forth by Dr. Skaudis into one of the hypothetical questions posed to vocational expert Mr. Brezinski, who, as noted above, responded that no jobs existed in the national economy for a person with those limitations.

applicable standard is set forth in 20 C.F.R. § 404.1527(c)(2)—which the ALJ noted in the decision—and provided that the SSA would give controlling weight to the opinion of a treating medical source *if* that opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques and was not inconsistent with the other substantial evidence in the case record. But Dr. Skaudis's extreme limitations on Plaintiff's functioning are not consistent with either Dr. Skaudis's own findings or those of other physicians, particularly the rheumatology specialists at both Essentia Health and Fairview Health who examined Plaintiff. Nor are Dr. Skaudis's findings supported by medically acceptable clinical and laboratory diagnostic techniques.

There is nothing in the medical records, including Dr. Skaudis's treatment notes, that substantiates Dr. Skaudis's opinion that Plaintiff would need many unscheduled breaks each day at work, and that Plaintiff could not be present at work at least four days per month. Dr. Skaudis does not point to any clinical or laboratory findings that supports these top-of-the-range restrictions. Significantly, no other medical provider, including specialists in rheumatology who also examined and treated Plaintiff's RA, offered an opinion that corresponds with Dr. Skaudis's. To the contrary, other providers commented that Plaintiff had full range of motion, no or slight swelling or tenderness, good grip and strength, a normal gait, and no need for an assistive device such as a cane. While there are some notations about swelling and tenderness, the existence of conflicting evidence does not support reversing the ALJ's decision. Dr. Skaudis's physical limitations are neither well-supported by clinical or diagnostic laboratory findings, nor consistent with substantial other evidence in the record.

The lack of supportability and consistency are also factors the ALJ should consider when deciding what weight—other than controlling weight—to afford an opinion. *See* 20 C.F.R. § 404.1527(c)(2) (listing other potential factors as the length and nature of the treatment relationship, frequency of examination, specialization, and other factors). Evidence the ALJ may consider is not limited to medical records, but "any other factors . . . which tend to support or contradict the medical opinion." 20 C.F.R. § 404.1527(c)(6). This includes the Plaintiff's own statements that he continued to hunt, fish, and to spend time doing increasingly difficult exercises with his compound bow to prepare for hunting season. Plaintiff also testified at the hearing that he did household chores. The ALJ identified these activities and abilities as a reason to give little weight to Dr. Skaudis's opinion. As to the more moderate limitations suggested by Dr. Skaudis, the ALJ appropriately factored those into Plaintiff's RFC. For example, Dr. Skaudis determined that Plaintiff should rarely climb ladders and stairs (R. 977), and the ALJ accordingly limited Plaintiff to occasionally climbing ladders and stairs (R. 17).

Turning to Dr. Skaudis's opinions about Plaintiff's mental health limitations, these are neither supported by diagnostic or laboratory findings nor consistent with the record as a whole. First, Dr. Skaudis did not provide a DSM-5 diagnosis in the line provided for one in the mental health section of the questionnaire (R. 981), nor did he list a mental health condition as a diagnosed impairment (R. 977). Second, support for Dr. Skaudis's opinions about Plaintiff's psychological limitations are not found anywhere in Dr. Skaudis's own records, which are devoted to Plaintiff's physical symptoms, treatment, and limitations,

and there is scant other evidence in the administrative record that could support Dr. Skaudis's mental health limitations.

In sum, the ALJ did not err in the methodology he used to determine the weight given to Dr. Skaudis's opinion of July 28, 2017, nor did he err in giving little weight to that opinion.

Plaintiff was evaluated by Dr. James Huber, a consulting psychologist, in November of 2017, for Minnesota's State Disability Services. (R. 1030.) Dr. Huber diagnosed Plaintiff with anxiety, agoraphobia, panic disorder, social anxiety disorder, an attention deficit disorder, and depression. (R. 1034.) Dr. Huber opined that Plaintiff would be markedly impaired in dealing with workplace stress and responding appropriately to coworkers and supervisors, due to anxiety; would be moderately to markedly impaired in his ability to concentrate and sustain attention; and would be moderately impaired in his ability to carry out work tasks with reasonable persistence and pace. (R. 1034.) Plaintiff would be able to understand and follow directions. (R. 1034.)

The ALJ addressed Dr. Huber's opinion and gave the functional limitations expressed therein little weight, finding the opinion internally inconsistent, unsupported by any mental health treatment records, and based largely on Plaintiff's subjective complaints (rather than clinical findings). (R. 22.) As the ALJ noted, Plaintiff has only sporadically sought any mental health treatment at all. Plaintiff attended five counseling sessions, each about 50 minutes long, with a social worker from March to May of 2018, for depression, anxiety, and PTSD. (R. 1038–45.) He ceased therapy when he moved in May 2018, and the ALJ found no record of further mental health therapy. (R. 23.) Plaintiff told a provider

in August 2018 that he had learned to manage his anxiety and took medication only as needed. (R. 1220.) As to the internal inconsistencies in Dr. Huber's evaluation report, the ALJ noted Dr. Huber found Plaintiff's memory functioning unremarkable, in general; the mental status examination was within normal limits. (R. 22.) On the whole, the ALJ gave good reasons for the little weight assigned to Dr. Huber's opinion. Moreover, the ALJ appropriately factored social and interpersonal coping deficits into Plaintiff's RFC by limiting Plaintiff to routine, simple tasks, and limiting, to infrequent and superficial, his interactions with coworkers, supervisors, and the public.

Plaintiff faults the ALJ for finding that Plaintiff could relate only occasionally and superficially to coworkers and supervisors. (Pl.'s Mem. at 15–16.) But the records on which Plaintiff relies were appropriately given little weight, as discussed above. Further, the ALJ's finding is partially consistent with the Mental RFC assessment by State agency consultative psychological examiners, who determined that Plaintiff had social interaction limitations, but was not significantly limited in accepting instructions and criticism from supervisors, getting along with coworkers, maintaining socially appropriate behavior in the workplace, and relating on an ongoing and superficial basis with coworkers and supervisors. (R. 78–79.) The ALJ gave some weight to this opinion, finding it consistent with and supported by other evidence of record. (R. 24.) The ALJ parted ways with the opinion in determining that Plaintiff could only occasionally, not on an ongoing basis, relate to coworkers and supervisors. In this respect, the ALJ's finding is more restrictive than the Mental RFC assessment by State agency consultative psychological examiners, and Plaintiff's challenge is therefore misplaced.

19

Plaintiff next takes issue with the ALJ's treatment of a one-page form Dr. Ghattaura submitted to the State Medical Review Team ("SMRT") of the Minnesota Department of Human Services. (Pl.'s Mem. at 12; R. 1036.) The ALJ gave little weight to the opinion because the determination that Plaintiff could not work in the foreseeable future was made under the standard for Minnesota disability benefits, not SSA regulations, and the opinion did not contain a function-by-function assessment. (R. 21.) The ALJ did not err in giving little weight to the SMRT record based on lack of supportability. Moreover, decisions by other governmental agencies are not binding on the SSA. 20 C.F.R. § 414.1504. Finally, the determination about whether a claimant is unable to work is reserved for the Commissioner. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

### 2. The ALJ's Determination that Plaintiff can Frequently Handle and Finger is Supported by Substantial Evidence in the Record as a Whole.

Plaintiff next argues that the ALJ's inclusion in the RFC of an ability to frequently handle and finger is not supported by substantial evidence. Plaintiff is not correct.

As discussed at length above, various medical providers documented, from 2015 to 2019, swelling and tenderness of Plaintiff's hands and wrists. Few, if any, noted any limitation on Plaintiff's range of motion, and none described the severity of Plaintiff's hand and wrist symptoms as more than mild. In addition, Plaintiff testified to numerous activities that required him to use his hands and fingers—driving, texting, preparing meals, vacuuming, using a leaf blower. The ALJ's decision to include in Plaintiff's RFC a finding that Plaintiff could frequently handle and finger was supported by substantial evidence on the record as a whole.

## IV.    CONCLUSION

The ALJ used the correct legal standard when evaluating Dr. Skaudis's July 28, 2017 opinion. His decision to assign that opinion little weight, notwithstanding Dr. Skaudis's status as a treating physician, is supported by substantial evidence of record, because Dr. Skaudis's limitations were neither supported by medically acceptable clinical and laboratory techniques, nor were they consistent with other substantial evidence in the administrative record. In any event, many of Dr. Skaudis's less extreme limitations were incorporated into the RFC. The ALJ's treatment of Dr. Huber's opinion was likewise supported by substantial evidence. Finally, the ALJ's decision to include in the Plaintiff's RFC a finding that Plaintiff could frequently handle and finger was supported by substantial evidence in the administrative record taken as a whole.

**IT IS THEREFORE RECOMMENDED THAT:**

1. Plaintiff's Motion for Summary Judgment (Dkt. No. 27) be **DENIED**;

2. Defendant's Motion for Summary Judgment (Dkt. No. 36) be **GRANTED**;

3. The decision of the Social Security Administration be **AFFIRMED**; and

4. **JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 20, 2022                            __*s/ John F. Docherty*_____
                                                   John F. Docherty
                                                   United States Magistrate Judge

**NOTICE**

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).